**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| **JAMES A. BEVERIDGE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No.** |
| | : | **7:08-CV-52 (HL)** |
| **HD SUPPLY WATERWORKS, L.T.D.,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## ORDER

Before the Court is Defendant HD Supply Waterworks, L.T.D.'s ("HD Supply")

Motion for Summary Judgment (Doc. 20).  For the following reasons, HD Supply's

Motion is granted in part and denied in part.

## I.    HD SUPPLY'S NOTICE OF OBJECTIONS

Before proceeding to the Motion for Summary Judgment, the Court notes that

HD Supply notified the Court (Doc. 33) that it objects to portions of James A.

Beveridge's ("Beveridge") affidavit filed in support of his Opposition to HD Supply's

Motion for Summary Judgment.  HD Supply argues that Beveridge's affidavit

contains statements that are speculative, not based on personal knowledge, and

contradictory to his prior deposition testimony.

The Court may only consider admissible evidence or evidence that can be

"reduced to admissible form" when deciding a motion for summary judgment.

Macuba v. Deboer, 193 F.3d 1316, 1322-23 (11th Cir. 1999).  Where an affidavit

directly contradicts deposition testimony without explanation, the affidavit may be stricken from the record.  <u>McCormick v. City of Fort Lauderdale</u>, 333 F.3d 1234, 1240 n. 7 (11th Cir. 2003).  When an affidavit is contradictory to the extent that it is "inherently inconsistent" with deposition testimony, a court should disregard the affidavit as a sham.  <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1530 (11th Cir. 1987).  The rule is used sparingly.  <u>Id.</u>  Otherwise, the discrepancy should be considered an issue of credibility and left for the factfinder to decide.  <u>McCormick</u>, 333 F.3d at 1240 n. 7.

In light of these standards, the Court has considered HD Supply's objections and has decided which  statements in the affidavit should be considered as true for purposes of summary judgment.  Some of HD Supply's objections are to statements that are irrelevant to deciding the Motion for Summary Judgment.  Explanations of the Court's rulings on HD Supply's objections to relevant statements are found in footnotes throughout the Facts and Procedural History section of this Order.  The remaining objections are overruled because their resolution would have no effect on the outcome of the Court's ruling.

## II.    FACTS AND PROCEDURAL HISTORY[1]

Beveridge was hired by HD Supply on June 5, 2006 to work as a systems

---

[1] The Court views the facts in the light most favorable to Beveridge as the nonmoving party.

manager in its Thomasville, Georgia office.  (SOMF[2] ¶ 1; Beveridge Dep. Vol. II at 178).  For the period of Beveridge's employment, HD Supply was an affiliate of The Home Depot, Inc.  (Brinson Dep. at 7).  Beveridge was supervised by Neil Brinson ("Brinson"), the Senior Manager of Information Technology.  (Brinson Decl. ¶ 2).  Beveridge's job responsibilities included planning, coordinating, and directing activities for the systems group.  The systems group maintained HD Supply's network and server infrastructure as well as the company's website and web-based applications.  (SOMF  ¶ 3; Beveridge Dep. Ex. 11).  Beveridge supervised seven staff members.  (SOMF  ¶ 3; Beveridge Dep. Vol. II at 203).  Staying awake and being alert on the job at all times was important for all HD Supply employees. (SOMF  ¶ 4; Brinson Decl.  ¶ 17).

Beveridge suffers from chronic insomnia and migraines.  (Beveridge Dep. at 136).  He has difficulty focusing at work and when he worked at HD Supply, he sometimes needed to take time off from work due to either his insomnia or his migraines.  (Beveridge Dep. at 137, 138).  Specifically, he sometimes asked for leave to arrive late to work when he had a bad morning. (Beveridge Dep. at 148). Even though his insomnia "affects [his] whole life," (Beveridge Dep. at 137), Beveridge said he is able to work around the side effects and is not prevented from

---

[2]  "SOMF"  refers to HD Supply's Statement of Material Facts (Doc. 20-4). The cited paragraphs are admitted by Beveridge in his response to the statement of facts.

doing anything.  (Beveridge Dep. at 142).

Brinson averred in his declaration that in August 2006 he saw Beveridge nod off with his eyes closed during a meeting.  (Brinson Decl. ¶ 5).  Because it was the first time he witnessed Beveridge nod off in a meeting, Brinson did not confront Beveridge about it. (Brinson Decl. ¶ 5).  Beveridge does not recall falling asleep at any meeting in August 2006.  (Beveridge Dep. Vol. II at 231).

Brinson testified that in January 2007 he observed Beveridge sleeping again during a department meeting.  (Brinson Decl. ¶ 6).  After the meeting, Brinson spoke with Beveridge and told  him that he had seen Beveride sleeping.  Brinson also said that he saw Beveridge sleeping previously during a meeting in August.  (Brinson Decl. ¶ 6).  Brinson admonished Beveridge, telling him that sleeping during meetings was unacceptable and must not happen again.  (Brinson Decl. ¶ 6).  Beveridge testified that in response to Brinson's concerns, he told Brinson that he struggled with insomnia and would seek medical help.  (Beveridge Dep. Vol. II at 248; Beveridge Aff. ¶ 37).  Beveridge also denies having been told by Brinson that Brinson had seen him sleeping in August 2006.  (Beveridge Aff. ¶ 36).

In March 2007, Beveridge received a favorable performance evaluation from HD Supply.  (Beveridge Aff. Ex.7).  The evaluation indicated that HD Supply desired that Beveridge grow and develop in his current position and develop a deeper technical understanding of the AS/400 technologies.  (Beveridge Aff. Ex.7).

On April 10, 2007, Brinson perceived Beveridge to be sleeping during another

office meeting.   (Brinson Decl.   ¶ 7).   When Beveridge awoke, Brinson said Beveridge kicked the table in the room, making a load noise, and this behavior embarrassed Brinson. (Brinson Decl. ¶ 7).   Beveridge responded that "as far as [he] knew, [he] was not sleeping in that meeting,"  (Beveridge Dep. Vol. II at 246) and there was no table in the meeting room for him to kick.  (Beveridge Aff. ¶ 40).

The following day, Brinson issued Beveridge a final written discipline counseling notice for "loafing,"[3] a work rule violation.  (Brinson ¶ 8; Beveridge Dep. Vol. II Ex. 22).   The notice stated that Beveridge had been sleeping during the meeting and "sleeping at work in the future will result in further disciplinary action, including possible termination." (Beveridge Dep. Vol II Ex. 22).   When he received the discipline notice Beveridge told Brinson that he had suffered from chronic insomnia since college. (Beveridge Dep. Vol. II at 248).   He asked Brinson for time to correct his problem.[4]  (Beveridge Aff. ¶ 76).   The notice indicated that Beveridge would go see a doctor to determine if he had a medical condition.  (Beveridge Dep. Vol. II Ex. 22).

---

[3] HD Supply's code of conduct defines "loafing" as "conduct during working hours that demonstrates a significant lack of attention to assigned duties and responsibilities (example: sleeping, reading for personal pleasure, etc.)." (Beveridge Dep. Ex. 16).

[4] HD Supply objects to this statement on the basis that it is contradictory to Beveridge's deposition statement that he asked Brinson for time off during his termination session on June 18, 2007.  (Beveridge Dep. Vol. III at 42).  The Court finds the statements are not contradictory.  Asking for "time" is not inconsistent with asking for "time off."

HD Supply maintains a code of conduct for employees. (Beveridge Dep. Ex. 16). Set forth within the code are definitions of work rule violations. (Beveridge Dep. Ex. 16). "Loafing" is defined as a minor work rule violation. The code of conduct also explains that there are multiple means for disciplining employees. One means is for the employer to use a "coaching session" to "bring to light an inappropriate behavior and/or action by an associate." Another possibility is to have a "counseling session," which is utilized to "call attention to a behavior and/or action that the associate has demonstrated in violation of [c]ompany policy or procedure." A "final counseling session" applies when "an associate demonstrates a pattern of behavior, repeatedly violates the [c]ompany's policies, and/or has received multiple [c]ounseling notices (more than two notices)." Finally, a "termination session" occurs after the employee has committed repeated violations of [c]ompany policies. It is the final step in the discipline process. (Beveridge Dep. Ex. 16).

Beveridge did not receive a written counseling session before he received a final counseling notice on April 11, 2007. (Beveridge Dep. Ex. 22). Similarly, another HD Supply employee, Richard Dold, received a final counseling notice without having first been given a counseling session. (Beveridge Dep. Ex. 17).

In May 2007, Brinson assigned Beveridge to supervise a technology project involving the transfer of technology equipment to HD Supply's Las Vegas office. (Beveridge Dep. Vol. II at 253; Brinson Decl. ¶ 9). The project was delayed and the wiring was not installed per industry specifications. (Brinson Decl. ¶ 9). Brinson

6

believed that the project was not well organized.  (Brinson Decl. ¶ 9).  Beveridge does not remember Brinson informing him that the wiring was not installed correctly. (Beveridge Dep. Vol. II at 252-53).

Beveridge saw a doctor for his insomnia on May 23, 2007, the first appointment the doctor had available for a new patient.  (Beveridge Dep. Vol. II at 222-23).   Beveridge began medical treatment and took additional time off for scheduled medical appointments.  (Beveridge Dep. at 148).  The doctor prescribed Beveridge Rozerem, a fairly new sleep medication.  (Beveridge Dep. Ex. 29). After his appointment, Beveridge presented Brinson with a copy of his examination form and a copy of the doctor's orders.  (Beveridge Aff. ¶ 88).

During his employment with HD Supply Beveridge took approximately a total of ten to eleven days off from work, not all of which was sick leave.  (Beveridge Dep. Vol. II at 212).   Brinson always provided Beveridge time off from work when Beveridge requested it, but he told Beveridge that "he thought [Beveridge] was taking too much time off, that [Beveridge] had missed too many days."  (Beveridge Dep. at 150).  Beveridge also stated that Brinson "seemed to have a very real problem with the fact that [Beveridge] was using sick leave," even though Brinson knew that Beveridge had not used up his available sick days.  (Beveridge Dep. Vol. II at 211).  Additionally, at some point during his employment, Brinson told Beveridge that "[Beveridge] had to be careful because he never got sick, didn't take time off, and he had a hard time understanding when people took sick leave."  (Beveridge

7

Dep. Vol. II at 211).    Beveridge also believes that Brinson disapproved of Beveridge's use of sick leave based upon Brinson's looks in his eyes and the tone of his voice.  (Beveridge Dep. Vol. II at 216-17).  Moreover, after Brinson perceived Beveridge sleeping on April 10, 2007, Beveridge testified that Brinson was "not as friendly and did not talk to me as frequently or in the same friendly manner as he had prior to April 10, 2007."[5]   Nonetheless, Beveridge stated that he felt comfortable talking to Beveridge and it was only during the last couple of conversations that Beveridge "felt like complete alienation" from Brinson. (Beveridge Dep. Vol. II at 218).

On June 14, 2007, Beveridge, Brinson, and another HD Supply employee traveled to Atlanta for a  meeting with a vendor.  During the meeting, Brinson noticed Beveridge sleeping and nodding off.  (Beveridge Dep. Vol. II at 255).  On the return trip Beveridge initially drove, but while stopped for gas in Atlanta Brinson asked for the keys and took over driving.[6]   (Beveridge Aff.   ¶ 119).   Upon arriving in

---

[5] This statement is not contradictory to Beveridge's statement that he felt comfortable talking to Brinson up until his termination.  The question posed to Beveridge in his deposition was "did [Beveridge] feel comfortable talking to [Brinson]?" (Beveridge Dep. Vol. II at 218).  Beveridge's affidavit merely expands on the nature of the relationship between Beveridge and Brinson prior to Beveridge's termination.  Any discrepancy is more an issue of credibility than an outright contradiction.

[6] HD Supply objects to this statement because Beveridge never mentioned the "driving" incident during his deposition testimony.  Citing no authority, HD Supply claims that Beveridge cannot introduce new evidence to support his ADA claim. As for the bar on introducing new evidence in an affidavit, the limitation only applies if HD Supply had no opportunity to respond to the introduction of the

Thomasville Brinson informed Beveridge that he had seen him sleeping during the meeting with the vendor.  (Beveridge Dep. Vol. II at 255).  Beveridge told Brinson that he did not recall nodding off.  (Beveridge Dep. Vol. II at 255).  He also said that if he did fall asleep without realizing it, such behavior could be a reaction to his sleep medication and he would talk to his doctor about the problem. (Beveridge Dep. Vol. II at 256-57).  Beveridge additionally offered to write an apology letter to the vendor, if necessary. (Beveridge Dep. Vol. II at 257).

The following Monday, on June 18, 2007, Brinson met with Beveridge twice. During the first meeting, Beveridge told Brinson that he would call his doctor and make an appointment as soon as the doctor's office opened.  (Beveridge Dep. Vol. II at 259).  He apologized again for giving the impression that he had fallen asleep and asked whether he needed to do "anything else to make the situation right." (Beveridge Aff. ¶ 125).  In response, Brinson told Beveridge to go about his work.

---

evidence.  See Fed. R.Civ. P. 6(b) (a moving party must file an affidavit with its motion for summary judgment in order to allow the opposing party time to respond to the affidavits filed by the moving party).  In this district, Local Rule 7.3 allows a summary judgment movant to file "any desired reply brief, argument or affidavit."  Here, HD Supply had the opportunity to respond to Beveridge's statement, and therefore the Court does not consider the evidence in the affidavit to be new.  Further, in the alternative, this statement is not contradictory to Beveridge's deposition testimony.  The question posed to Beveridge in the deposition was a legal question regarding whether he knew of other facts to support his claims and to which he answered, "I can't think of anything else specifically that I think should be brought up."  There is nothing contradictory about later including information that indeed is relevant to his claim, which the Court believes was information Beveridge did not think of at the time he gave his deposition.

(Beveridge Dep. Vol. II at 258).

Later that day Brinson terminated Beveridge.  The reason for the termination, as listed in the termination notice, is nodding off/sleeping during a meeting. (Beveridge Dep. Ex. 23).  Brinson, however, in deciding whether to terminate Beveridge also considered that Beveridge had been working at HD Supply for only one year and was not an exceptional employee." (Brinson Decl. ¶13).  He also "specifically considered the recent problems with [HD Supply's] Las Vegas office move and [Beveridge's] AS/400 computer system knowledge." (Brinson Decl. ¶ 13). Beveridge testified that Brinson told him at the termination meeting that he had expected him to be "more proficient in [his] understanding of the AS/400 system by that time."  (Beveridge Dep. Vol. II at 253-54; Beveridge Aff. ¶ 131).

Also during the termination meeting, Beveridge asked Brinson for time off from work.[7] (Beveridge Aff. ¶ 76).   Specifically, Beveridge asked whether he "could be given time to either . . . get this problem solved, or give [him] a week or two to – at least to try start getting some resumes out." (Beveridge Dep. Vol. II at 260).  He also asked "if there was any possibility of delaying the process, of [him] trying to work on it in some way." (Beveridge Dep. Vol. II at 261).  Despite these requests, Brinson

---

[7] HD Supply objects to this statement.  The Court finds that this statement in the affidavit is consistent with Beveridge's deposition testimony.  Beveridge stated in his deposition that he asked for time off from work during the termination meeting on January 18, 2007.  (Beveridge Dep. Vol. III at 42).  Thus, the Court will consider as true for summary judgment that Beveridge asked for time off from work during the termination meeting.

stood by his decision to terminate Beveridge.

Beveridge filed a charge of discrimination against HD Supply with the Equal Employment Opportunity Commission ("EEOC").  (Beveridge Compl. Ex. 1).  On January 4, 2008, the EEOC dismissed the charge because it was "unable to conclude that the information obtained establishes violations of the statutes." (Beveridge Compl. Ex. 1).  On April 23, 2008, Beveridge filed a complaint against HD Supply in this Court alleging: (1) that it discriminated against him on the basis of his disability when it terminated his employment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*; and (2) that it violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, when it terminated Beveridge after he requested leave or took leave due to his medical condition.  On April 14, 2009, HD Supply filed this Motion for Summary Judgment.  HD Supply argues it is entitled to judgment as a matter of law as to all issues raised by Beveridge's complaint.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a defendant's motion for summary judgment, the court takes the facts in the light most favorable to the plaintiff.

11

Stanley v. City of Dalton, 219 F.3d 1280, 1287 (11th Cir. 2000).  The court may

not, however, make credibility determinations or weigh the evidence.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden lies on the movant to demonstrate that the nonmovant

lacks evidence to support an essential element of its claim.  Lowe v. Aldridge,

958 F.2d 1565, 1569 (11th Cir. 1992).  The burden then shifts to the nonmovant,

who must come forward with some evidence that would allow a jury to find in his

favor, even if the parties dispute that evidence.  Id.  If the evidence that the

nonmovant presents, however, is "not significantly probative" or "merely

colorable," then summary judgment may be granted.  Liberty Lobby, 477 U.S. at

249.

### B.    Beveridge'S ADA Claim

The ADA prohibits an employer from discriminating against "a qualified

individual with a disability because of the disability of such individual in regard to  .

. . discharge of employees . . . ."  42 U.S.C. § 12112(a).  Plaintiffs pursuing ADA

claims based on circumstantial evidence are required to prove discrimination under

the traditional Title VII burden-shifting framework.  Earl v. Mervyns, Inc., 207 F.3d

1361, 1365 (11th Cir. 2000).  The burden-shifting analysis first requires the plaintiff

to establish a prima facie case of discrimination.  Id. To establish a prima facie case

of discrimination under the ADA, a plaintiff must show: (1) she is disabled; (2) she

is a qualified individual; and (3) she was subjected to unlawful discrimination

because of her disability.  Id.

HD Supply argues that Beveridge has not established the first prong of a prima facie case, that he is disabled.  The ADA defines a disability as a "(a) physical or mental impairment that substantially limits one or more major life activities of such individual; (b) having a record of such an impairment; or (c) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Beveridge does not argue that he falls under the first prong; instead, Beveridge claims that he is disabled under the third prong because HD Supply regarded him as being disabled.

A plaintiff may be "regarded as" disabled in two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L.Ed.2d 450 (1999).[8]  Beveridge claims that HD Supply committed the second mistake.

---

[8] Sutton v. United Air Lines, Inc., was superseded by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  Effective January 1, 2009, the "regarded as" definition of disabled is satisfied if "[the plaintiff] has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).  Under this broadened definition, Beveridge would likely be successful in proving he was "regarded as" disabled, but courts have consistently held the amendments are not retroactive.   Fikes v. Wal-Mart, Inc., 322 Fed. Appx. 882, 883 n. 1 (11th Cir. Apr. 10, 2009) (unpublished); Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 566 (6th Cir. 2009).  The events that gave rise to Beveridge's ADA claim took place before the amendments went into effect.  The Court therefore

"Major life activities" include functions such as working.   29 C.F.R.   § 1630.2(I).  Beveridge argues that HD Supply regarded him as being substantially limited in his ability to work.  To show that HD Supply perceived him as being substantially limited in his ability to work, Beveridge must demonstrate that HD Supply thought he was unable to perform "either a class of jobs or a broad range of jobs as compared to the average person having comparable training, skills and abilities."  Carruthers v. BSA Adver. Inc., 357 F.3d 1213, 1216 (11th Cir. 2004) (adopting 29 C.F.R. § 1630.2(j)(3)(I)).  This is a difficult hurdle for a plaintiff to overcome.  He must demonstrate not only that his employer thought he was disabled, but also that his employer thought his disability would prevent him from performing a broad class of jobs.  Ross v. Campbell Soup Co., 237 F.3d 701, 709 (6th Cir. 2001). It is not enough for an employee to show that his employer thought that he could not perform a single, particular job nor is it sufficient if the employee merely shows that the employer was aware of his impairment.  Id. at 1216, 1217.

The "regarded as disabled" prong focuses on the "impairment's effect upon the attitude of others."  Gordon v. E.L. Hamm & Ass., Inc., 100 F.3d 907, 913 (11th Cir. 1996).  Thus, the prong is generally satisfied if there are statements or conduct by the plaintiff's employer that create an inference that the employer thought that the employee was unable to work generally.  See e.g., Wilson v. Phoenix Specialty Mfg.

_____

applies the prior version of the statute as well as the case law interpreting the prior version.

14

Co., Inc., 513 F.3d 378, 385 (4th Cir. 2008) (finding "regarded as" prong satisfied where the employer sent an e-mail which stated that plaintiff qualified for an ADA designation); Ward v. Sorrento Lactalis, Inc., 392 F. Supp. 2d 1187, 1192 (D. Idaho 2005) ("regarded as" prong not satisfied where the only evidence was that employee was told that he could be fired for the drowsiness that his medication was causing and employee was fired after employer asked him if he was still on medication); Enright v. Accurate Transmissions, Inc., No. 10 C 1686, 2003 WL 22383009, at *5 (N.D. Ill. Oct. 17, 2003) ("regarded as" prong satisfied where employer stated that employee's medical condition prevented employee from handling "job-related stress", which if true meant that employee could not perform eighty-two percent of the jobs utilizing similar training and skills).

Beveridge points to six pieces of evidence to support his argument that HD Supply regarded him as unable to perform a class of jobs or a broad range of jobs. First, Beveridge argues that Brinson's embarrassment when Beveridge nodded off in meetings constitutes evidence that Brinson thought Beveridge was unable to work. "Where a defendant's recognition of plaintiff's limitations was not an erroneous perception, but instead was a recognition of fact, . . . a finding that a plaintiff was regarded as disabled . . . is inappropriate." Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1230 (11th Cir. 1999). The Court finds that this evidence does not indicate that Brinson thought Beveridge was disabled; rather, the only inference that can be drawn is that it is a reaction to Beveridge's inappropriate

15

behavior, not an expression of any perceived disability.

Second, Beveridge asserts that Brinson's changed attitude toward Beveridge after Beveridge fell asleep in April 2007 shows that Brinson perceived Beveridge as unable to work.  A change in attitude by an employer is circumstantial evidence that the employer regarded the employee as disabled.  Walsh v. Bank of Am., 320 Fed. Appx. 131, 133 (3d Cir. March 26, 2009) (unpublished).  Nevertheless, Brinson's changed attitude towards Beveridge cannot constitute per se proof that he regarded Beveridge as disabled.  Without other supporting evidence, the Court cannot conclude that the changed attitude, standing alone, satisfies Beveridge's burden of showing a genuine dispute of material fact as to whether Brinson regarded him as disabled.

Third, Brinson watched Beveridge more closely in at least one meeting, which Beveridge claims is evidence that Brinson regarded him as disabled.  For the same reason given for Beveridge's first piece of evidence, the Court finds that only one inference can be made: Brinson's behavior is merely a reaction to Beveridge's inappropriate conduct and not evidence that Brinson perceived Beveridge to be disabled.

Fourth, Beveridge asserts that Brinson regarded him as disabled because Brinson refused to allow Beveridge to drive home from Atlanta after he appeared to fall asleep in the June 15, 2007 meeting. The Court does not find that this assertion supports a finding of perceived disability.  If Brinson believed that Beveridge's

insomnia interfered with his ability to drive, then his conduct of refusing to allow Beveridge to drive gives rise to the inference that Brinson perceived Beveridge as unable to drive.  His conduct does not give rise, however, to the inference that Brinson thought Beveridge's insomnia interfered with his ability to perform his job or other types of jobs that Beveridge would have the training, skills, and abilities to perform.  In other words, there is no evidence indicating that Beveridge's inability to drive would prevent him from working in his current job or in other information technology jobs.  The only permissible inference that can be drawn is that Beveridge was limited in one of his many possible job duties, driving.  It is well established that '[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  Rossbach v. City of Miami, 371 F.3d 1354, 1359 (11th Cir. 2004).  Thus, the Court finds that such a narrow perceived restriction does not constitute a perceived substantial limitation on Beveridge's ability to work.

The fifth and sixth pieces of evidence offered by Beveridge are that Brinson did not offer Beveridge, as an alternative to termination, another position within HD Supply, and Brinson fired Beveridge specifically because he had fallen asleep during meetings.  As to Brinson's failure to accommodate Beveridge by hiring him for another position, there is no Eleventh Circuit precedent on point addressing this issue, but the Court adopts the conclusion reached by other circuits, which is that such conduct cannot serve as proof that Brinson regarded Beveridge as disabled.

17

See Nazum v. Ozark Auto. Distrib., Inc., 432 F.3d 839, 848-49 (8th Cir. 2005) (stating that a failure to hire the employee for another position could not constitute proof that employer regarded employee as disabled); see also E.E.O.C. v. J.B. Hunt Transp., Inc., 321 F.3d 69, 77 (2d Cir. 2003) (reasoning that "a finding of perceived disability may not rest merely on a single employer's failure to hire a candidate."). "To hold otherwise would be allowing a disability claim in by the back door when the plaintiff failed to prove he was disabled." Nazum, 432 F.3d at 849.

As for the sixth piece of evidence, Brinson's termination of Beveridge allegedly due to sleeping during meetings also does not raise the inference that Brinson thought Beveridge could not work generally.  At most, it raises the inference that Brinson fired Beveridge because he continued to sleep at work, not because Brinson perceived Beveridge to be incapable of performing his job.  See Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002) (finding that the evidence showed the employee was terminated for misconduct and not because of a perceived disability).

Finally, Beveridge argues that the same type and amount of circumstantial evidence of perceived disability present in Mendiola v. Vision Hospitality, 588 F. Supp. 2d 1295 (M.D. Ala. 2008) exists in his case.  In Mendiola, the court found that the temporal proximately between the plaintiff's disclosure of his leukemia diagnosis and his employer's decision to find a replacement was evidence of discriminatory motive.  Mendiola, 585 F. Supp. 2d at 1305.  The court also found the EEOC's

18

probable cause determination of discrimination was probative evidence of whether the employer regarded the plaintiff as disabled. <u>Id.</u>  Finally, the court concluded that the severity of the plaintiff's diagnosis raised a stronger inference that the employer regarded the plaintiff as disabled. <u>Id.</u>

Beveridge's termination occurred within days of his last alleged sleeping incident.  Thus, there is some evidence supporting the inference that Brinson regarded him as unable to work, but that is where the similarity between his case and <u>Mendiola</u> ends.  In Beveridge's case, the EEOC found that it could not determine whether Beveridge had a viable claim of disability discrimination.  Further, occasional insomnia is of a different nature than leukemia.  Beveridge's impairment bordered on an inconvenience and there is no evidence that it was life-threatening or as debilitating as leukemia.  The Court finds that even in viewing the facts in the light most favorable to Beveridge, a  different assumption must arise than that which arose in <u>Mendiola</u>.

In sum, Beveridge has not met his burden of creating a genuine issue of material fact as to whether Brinson thought he was unable to perform a class of jobs or a broad range of jobs.  Brinson's change in attitude and the temporal proximity between his termination and sleeping incident are the two pieces of evidence that faintly support his position.  Taken together they create a mere scintilla of evidence, which does not create a strong enough inference that Brinson regarded Beveridge as disabled.  Summary judgment must be granted to HD Supply on Beveridge's ADA

19

claim.

### C. Beveridge's FMLA Claim

The FMLA entitles an eligible employee to take twelve workweeks of leave during any twelve-month period because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.  29 U.S.C. § 2612(a)(1)(D).   In addition to taking twelve weeks of leave at once, an employee may take intermittent leave in separate blocks of time because of a single qualifying medical reason. 29 C.F.R. § 825.202(a).  To preserve these rights to take leave, the FMLA creates two types of claims: interference claims, in which an employee alleges that his employer denied him a benefit guaranteed under the Act, 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.   29 U.S.C. § 2615(a)(2).

Retaliation and interference claims have different standards of proof.  To state an interference claim, a plaintiff must demonstrate that he was entitled to a benefit under the FMLA and the employer denied him the benefit.  Strickland v. Water Works & Sewer Bd. of the City of Birmingham, 239 F.3d 1199, 1206-07 (11th Cir. 2006). The employer's motives are irrelevant. Id. at 1208.  In contrast, to succeed on a retaliation claim a plaintiff must show that the employer acted with discriminatory or retaliatory animus when the plaintiff was discharged. Id.  at 1207.

In his complaint, Beveridge alleges that he was terminated after "requesting and/or taking leave due to a serious medical condition."  The Court construes this allegation as stating: (1) a claim for interference on the basis that HD Supply ended his employment, which effectively denied his request for FMLA medical leave; and (2) a claim for retaliatory discharge asserting that HD Supply intentionally terminated him because he requested FMLA leave.

### 1.    Beveridge's Interference Claim

HD Supply argues for summary judgment on Beveridge's interference claim on the basis that Beveridge did not assert his FMLA right to take FMLA medical leave prior to his termination and therefore HD Supply's decision to terminate him could not have interfered with his right to take FMLA medical leave.  It argues that Beveridge asserted his FMLA right to take medical leave when he asked Brinson for time off after Brinson told Beveridge he was fired.  In contrast, Beveridge argues he satisfied his FMLA notification obligation before HD Supply terminated him.

An employee's FMLA notice is valid if it is "sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated time and duration of the leave."  29 C.F.R. § 825.302(c).  The employee is not required to "expressly assert rights under the FMLA or even mention the FMLA."  29 C.F.R. § 825.302(c).  Essentially, there are two components of a valid notice: (1) the notice must inform the employer that the employee desires time off from work; and (2) the notice must assert that the requested absence is due to a FMLA qualifying condition.

21

After the employee makes the appropriate statement, the responsibility then falls on the employer to inquire further about whether the employee is seeking FMLA leave. 29 C.F.R. § 825.302(c).

In this case, HD Supply does not contest that Beveridge's insomnia and migraines qualify as a FMLA qualifying medical condition; rather, it disputes whether Beveridge asked for a leave of absence before he was terminated. In light of HD Supply's position, the Court assumes for summary judgment purposes that Beveridge's illnesses qualify as FMLA medical conditions. It confines its analysis to when Beveridge requested time off from work due to his medical conditions.

The evidence supporting HD Supply's position that Beveridge asked for time off only after HD Supply terminated him is that after he was terminated, Beveridge asked Brinson for time off to get his problem solved. Prior to this request, on June 15, 2007, Beveridge told Brinson that he would talk to his doctor about his sleeping problem. In addition, on the morning of June 18, 2007, Beveridge told Brinson that he was calling his doctor that morning to make an appointment. Beveridge's request for time off to get his problem solved is more clearly a request for time off when compared to his statements about seeking medical attention for his sleeping problem.

Taken in isolation, the statements made before the termination meeting do not provide Brinson sufficient information to put Brinson on notice that Beveridge was seeking time off from work prior to being terminated. Nevertheless, an employee

22

can adequately convey to the employer sufficient information to put the employer on notice, either at the time of the request or before, that an absence is potentially FMLA qualifying. Cruz v. Publix Super Mkts., Inc., 428 F.3d 1379,1384 (11th Cir. 2005).  Pursuant to this standard, the Court concludes there is other evidence which shows that Beveridge's statement made on the morning of June 18th telling Brinson he was making an appointment to see his doctor creates a material dispute of fact as to whether Brinson was on notice that Beveridge was requesting medical leave. The evidence includes: (1) Beveridge had taken time off previously to see his doctor for his insomnia; (2) Beveridge had always notified Brinson when Beveridge needed time off for medical treatment; and (3) Beveridge would offer Brinson documentation from his physician verifying that his absences were due to medical treatment.  Based on this evidence of Beveridge's past conduct,[9] a genuine issue of fact exists as to whether Brinson was put on notice that Beveridge would need time off from work when Beveridge said on the morning of June 18th that he would call and make a doctor's appointment as soon as the doctor's office opened.

The Court makes this conclusion even though HD Supply points out that

---

[9] The Court does not conclude that Beveridge's past conduct constitutes requests for FMLA leave.  The Court is aware that Beveridge was not eligible for FMLA leave until June 5, 2007, twelve months after he began working for HD Supply.  See 29 C.F.R. § 825.110(b) (stating that an employee must have worked for the employer for at least 12 months to be eligible for FMLA leave). Instead, the Court finds Beveridge's past conduct is probative of whether Brinson should have reasonably believed that Beveridge sought time off on June 18th prior to his termination.

Beveridge admitted in his deposition that he first requested FMLA-qualifying leave during his termination meeting. Whether the employee believes his request for leave is FMLA qualifying is not relevant given that the statute places the burden on the employer to determine whether an employee's request for leave falls within the FMLA. 29 C.F.R. § 825.302(c). The statute "does not contemplate allowing employers to benefit from their employee's lack of knowledge about their FMLA rights." Nasbaum v. CB Richard Ellis, Inc., 171 F. Supp. 2d 377, 381 (D.N.J. 2001) (quoting Routes v. Henderson, 58 F. Supp. 2d 959, 980 (S.D. Ind. 1999)).

Thus, there is sufficient evidence to create a genuine issue of fact as to whether Beveridge's statement in the morning of June 18th conveyed Beveridge's intent to take time off from work to seek treatment for his insomnia. A reasonable jury could find that Beveridge provided the requisite FMLA notice to Brinson prior to his termination. If Beveridge did provide the requisite notice, Brinson's decision to terminate him would constitute an interference with Beveridge's right to FMLA leave. Summary judgment is therefore denied as to Beveridge's interference claim.

### 2.    Beveridge's Retaliation Claim

In the absence of direct evidence of discrimination by the employer, the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), is applied in evaluating FMLA retaliation claims. To state a claim of retaliation an employee must first establish a prima facie case of retaliatory discharge. An employee must show that: (1) he

24

engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action.  Strickland,  239 F.3d at 1207.  Once an employee establishes a prima facie case, the burden of production shifts to the employer "to articulate a legitimate reason for the adverse action."  Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1296, 1297 (11th Cir. 2006).  If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Id. at 1298 (quoting Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000)).  To show pretext, the employee may rely on evidence that he already produced to establish his prima facie case.  Martin v. Brevard County Pub. Schools, 543 F.3d 1261, 1268 (11th Cir. 2008).

### i.   Prima Facie Case

HD Supply disputes whether Beveridge has established a prima facie case of discrimination.  Specifically, HD Supply argues that Beveridge has not established the first and third elements: Beveridge did not engage in a protected activity nor was there a causal connection because he requested FMLA leave after he was no longer an employee of HD Supply.  Beveridge argues that he provided HD Supply notice of his intent to take FMLA leave before he was terminated thereby establishing a prima facie case of retaliation.

25

As to the first element, a request for FMLA qualifying medical leave is protected activity under the FMLA. 29 U.S.C. § 2612(a)(1)(D).  The Court has already found Beveridge has raised a genuine issue of material fact of whether he provided notice to HD Supply of his intent to take FMLA medical leave.  By doing so, Beveridge has raised genuine issues of material fact of whether he engaged in statutorily protected activity under the FMLA.

In regard to the third element, to establish a causal connection, "a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" Brungart v. Bellsouth Telecomm., Inc.,231 F.3d 791, 799 (11th Cir. 2000) (quoting Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999).  Generally, this requirement is satisfied if there is a close temporal proximity between the employee's protected conduct and the adverse employment action.  Id. An exception to this rule occurs where there is unrebutted evidence that the decision maker had no knowledge that the employee had engaged in protected conduct.  Id. This exception exists because a decision maker cannot retaliate against something unknown to him.  Id.

The evidence presented in the record shows that Beveridge was terminated by Brinson a few hours after he informed Brinson that he was calling the doctor to make an appointment over concerns about his insomnia.  Again, the Court finds that a reasonable juror could find that Beveridge's statement was a request for FMLA medical leave.   Thus, there was a temporal proximity between Beveridge's

termination and his request for FMLA qualifying leave.  Additionally, there is enough evidence to create a genuine dispute as to whether the exception to the rule applies because Brinson terminated Beveridge and there is evidence showing that Brinson was put on notice that Beveridge request FMLA medical leave prior to his termination.

Beveridge has successfully shown a genuine issue of material fact exists as to his prima facie case of retaliation.

### ii.    Pretext

Even assuming that Beveridge has established a prima facie case of retaliation, HD Supply argues that it has articulated a legitimate non-discriminatory reason for terminating Beveridge, which Beveridge has failed to show was pretextual.   HD Supply's legitimate non-discriminatory reason for terminating Beveridge is that Beveridge violated HD Supply's policy of not sleeping at work.  To rebut this legitimate reason, Beveridge alleges four inconsistencies: (1) HD Supply contrived the August 2006 sleeping incident; (2) HD Supply failed to follow its own policy on disciplining employees when it fired Beveridge; (3) Brinson violated HD Supply's policy by incorrectly indicating on Beveridge's counseling notices that "loafing" was a major offense; and (4) Brinson prepared a document which describes conduct other than loafing as grounds for terminating Beveridge.

Beveridge's assertion that Brinson contrived the August 2006 sleeping incident is slightly probative of pretext.  Beveridge has presented no evidence, other

27

than his bare allegation, that Brinson contrived the event.  Generally, "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext. . . ."  Grisby v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987).  In this case, however, Beveridge has produced other evidence of pretext.  The Court finds that Beveridge's allegation does support an inference of pretext given that there is other, stronger evidence of pretext in the record.

As for Beveridge's second and third reasons, HD Supply argues that its policies were discretionary and even if the policies were mandatory, HD Supply's failure to comply with them was not evidence of pretext because HD Supply failed to follow procedure with Richard Dold.  When company policies are mandatory, failure to follow policies is not evidence of pretext when there is evidence showing that the employer failed to follow proper procedure with another employee.  Rojas v. Florida, 285 F.3d 1339, 1344 n. 4 (11th Cir. 2002).

HD Supply's discipline policy states that a final counseling session occurs when "an associate demonstrates a pattern of behavior, repeatedly violates the [c]ompany's policies, and/or has received multiple [c]ounseling notices (more than two notices)."  Beveridge argues that HD Supply was required to provide him more than two counseling notices before it issued him a final counseling notice, which it did not do and therefore it violated its policy.  The Court disagrees.  The use of "and/or" preceding  "has received multiple [c]ounseling notices (more than two notices)" shows that a final counseling session can be issued even if an employee

28

has not received multiple counseling notices in the past. It is a permissive standard that applies where the employee has demonstrated a pattern of behavior or has repeatedly violated the company's policy.   Given that Beveridge had been reprimanded for sleeping during work more than once before receiving a final termination notice, HD Supply's failure to provide more than two counseling notices cannot support an inference of pretext.

Beveridge's third reason for pretext is that Brinson incorrectly labeled "loafing" as a major work violation on Beveridge's counseling notices.   According to HD Supply's policy, "loafing" is a minor work rule violation.   Notably, however, Brinson also labeled "loafing" as a major work violation on Richard Dold's final counseling notice.   Thus, the evidence in the record demonstrates that Brinson incorrectly, but consistently labeled loafing as a major work violation.   This reason is not evidence of pretext.

Beveridge's fourth assertion, however, supports the inference that HD Supply's reason for terminating Beveridge was pretextual.   HD Supply argues that Brinson prepared the document prior to terminating Beveridge's employment and used it to consider whether other factors should mitigate his discharge.   Factors listed in the document include Beveridge not having enough experience with a computer system, the Las Vegas office move was delayed because of Beveridge, and Beveridge had missed several days of work.   HD Supply contends that ultimately Brinson found that these factors did not weigh against firing Beveridge for

sleeping.

The Court finds that the mere existence of the document, which Brinson admits he wrote, creates an issue of fact of whether HD Supply's reason for terminating Beveridge may have been false and that the real reason for terminating Beveridge was because Brinson was unhappy with the amount of time off Beveridge took and by Beveridge's request for time off that he made on the morning of June 18th.  A jury could draw the reasonable inference that the reasons in the document, written by Brinson either before or after he terminated Beveridge, constitute some or all of the reasons for Beveridge's termination. This conclusion is supported by other evidence in the record, mainly Merrie Moye's deposition testimony.  She testified that Brinson telephoned her to notify her that he was firing Beveridge. During the conversation Brinson told her that "[Beveridge's] job performance had not improved, that the sleeping continued, and that it was – you know, he just didn't think it was going to ever get any better." (Moye Dep. at 16).  Moreover, Brinson admitted to Beveridge during the termination session that he was unhappy with Beveridge's job performance because he thought Beveridge should have become more knowledgeable about the AS/400 system.   (Beveridge Dep. Vol. II at 253-54; Beveridge Aff. ¶ 131).  From this testimony, it is reasonable to conclude that Brinson may have terminated Beveridge because of his poor job performance, which includes his use of his available sick leave and for asking for time off on the morning of June 18th  to see his doctor.

Finally, the Court finds other circumstantial evidence of pretext in the record. First, as has already been established, there is an issue of fact whether Beveridge provided notice to Brinson of his intent to take FMLA medical leave.  If he did, then within hours of providing notice, Brinson terminated Beveridge.  Temporal proximity between an employee's termination and request for FMLA leave is evidence of pretext.  Dougherty v. Mikart, Inc., 205 Fed. Appx. 826, 828 (11th Cir. Dec. 19 2006) (unpublished).

Second, Brinson expressed dissatisfaction with Beveridge's use of his sick time.  Beveridge testified that Brinson told Beveridge that "he thought [Beveridge] was taking too much time off, that [Beveridge] had missed too many days." (Beveridge Dep. at 150).  Brinson also told Beveridge that "he had to be careful because he never got sick, didn't take time off, and he had a hard time understanding when people took sick leave." (Beveridge Dep. Vol II at 211).  The Court finds that these statements are evidence which a juror could reasonably rely upon in finding that Beveridge was not terminated for falling asleep, but because Brinson was dissatisfied with Beveridge's use of his available sick time and his most recent request for time off to see a doctor for treatment.  Reading the facts in the record in Beveridge's favor, the Court concludes that Beveridge's fourth articulated reason for pretext and the other circumstantial evidence in the record create a genuine issue of material fact as to whether HD Supply's reason for terminating Beveridge was pretextual.  Consequently, summary judgment on the retaliation claim

31

is not warranted.

Accordingly, HD Supply's Motion for Summary Judgment is granted in part and denied in part.

**SO ORDERED**, this the 7th day of December, 2009.

*s/ Hugh Lawson*
**HUGH LAWSON, Senior Judge**

lmc